1   UNITED STATES DISTRICT COURT

2   DISTRICT OF CONNECTICUT

3

    CONSERVATION LAW FOUNDATION,)
4   INC.,                      )
                   Plaintiff,  )   NO: 3:21CV201(JBA)
5                              )
    vs.                        )
6                              )   October 26, 2022
    ALL-STAR TRANSPORTATION,   )
7   LLC, et al.,               )
                   Defendant.  )   Motions Hearing
8   _____

9

                        450 Main Street
10                    Hartford, Connecticut

11  B E F O R E:
            THE HONORABLE THOMAS O. FARRISH, U.S.M.J.
12

    A P P E A R A N C E S:
13

    For the Plaintiff :        HEATHER A. GOVERN
14                             Conservation Law Foundation
                               62 Summer Street, Ste Apt 2
15                             Boston, MA 02110

16  For the Defendant:         JONATHAN R. SHULAN
                               Armstrong Teasdale, LLP
17                             7700 Forsyth Blvd., Suite 1800
                               St. Louis, MO 63105

18

19

20

21

22

23
    Transcriber:               Martha C. Marshall, RMR, CRR
24

25  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

1          THE COURT:  Good afternoon, everybody.

2          We're here in the matter of Conservation Law

3   Foundation, Incorporated versus All-Star Transportation, LLC,

4   et al.  It's case number 21-CV-201.  It's assigned for trial

5   to Judge Arterton.

6          My name is Judge Farrish.  May I have the

7   appearances of counsel, please, beginning with the plaintiff.

8          MS. GOVERN:  Good afternoon, Your Honor.  My name is

9   Heather Govern.  I'm representing the plaintiff, Conservation

10  Law Foundation.

11         THE COURT:  Good afternoon, Attorney Govern.

12         And for the defendants.

13         MR. SHULAN:  Your Honor, my name is Jonathan Shulan,

14  representing the defendants All-Star Transportation, LLC, and

15  Student Transportation of America, LLC.

16         THE COURT:  Good afternoon to you, Attorney

17  Shulan.

18         All right.  So we're here for a hearing on two

19  motions.  First, on the Motion for Leave to Amend that the

20  plaintiff has filed on the docket at ECF number 53.  And,

21  also, on the Motion to Compel that they've filed at ECF

22  number 63.

23         So I will tell you that I have read both the

24  motions, the memoranda.  And in the case of the Motion to

25  Compel, I have read the opposition at ECF number 66 and the

1    reply at ECF number 67.  And in the case of the Motion to

2    Compel, I've read the opposition at ECF number 68 and ECF

3    number 72.  So neither side should feel constrained to go

4    over any of the materials that were in their papers.

5        But with that said, let's take up the Motion for

6    Leave to Amend first.  Attorney Govern, are you arguing for

7    the plaintiff today?

8        MS. GOVERN:  Yes, I am, Your Honor.

9        THE COURT:  Okay.  Very well.  So I will let you

10   make whatever points you want to make in whatever point you

11   would like to make them, but if you would please include in

12   your remarks the Foundation's answer to the following

13   question:

14       If I were to conclude that Rule 16's good cause

15   standard applies here, can you tell me whether the Foundation

16   has met it and, if so, how?

17       MS. GOVERN:  Sure, Your Honor.  I would argue that

18   and CLF argues that the more liberal standard under Rule 15

19   does apply here, not the Rule 16(b) good cause standard,

20   simply because the Court has not set a deadline for amending

21   the pleadings.  The cases that reference Rule 16(b), the good

22   cause standard, involve missed amendment deadlines in

23   scheduling orders.  And we did not have that here.

24       THE COURT:  Well, we'll talk about that in a

25   second.  But I'd just like to hear whether or not CLF

1    contends that it has satisfied the Rule 16 standard if it

2    applies.

3            MS. GOVERN:  We do believe we've satisfied the Rule

4    16 standard, Your Honor.  In this case, there has

5    been -- there's been no bad faith.  We're not causing any

6    undue delay.  And we are pretty much asking for the discovery

7    that was allowed by Judge Arterton from the October 21st

8    conference, where Judge Arterton stated that we would be

9    allowed to determine and clarify the parent status of

10   All-Star, leaving the door open for an amendment which,

11   again, is consistent with the relevant case law, that an

12   amendment in these circumstances should be allowed.  There is

13   not at all delays in some of the other cases where we're

14   talking about two years, four years.

15           The Motion to Dismiss has not been filed yet by the

16   defendants.  We are in a period of time where we should be

17   freely able to amend the complaint.  And, again, this was an

18   issue of not having the documentation demonstrating that LLC

19   should have been Inc.  So in cases where there has just been

20   that slight issue of the name of the defendants, the cases

21   have allowed those amendments to go forward.

22           THE COURT:  Okay.  Well, so you started off by

23   talking about lack of bad faith and lack of delay and so

24   forth.  Those are, of course, our standards under Rule 15.

25           MS. GOVERN:  Right.

1          THE COURT:  Under Rule 16 we have a good cause

2     standard which incorporates the concept of diligence.  You

3     know, I think we knew there was an issue about who the right

4     corporate entity is here.  And is it your contention that CLF

5     explored that diligently?  And, if so, walk me through how.

6          MS. GOVERN:  Yes, Your Honor.  The public documents

7     that we've put into the record, CLF has put into the record,

8     demonstrates this ambiguity regarding which STA entity is

9     All-Star's parent company.

10          So I'll point you to ECF number 536.  That's a

11     Delaware State -- Secretary of State page that lists four

12     different entities named STA.  In addition, we've attached an

13     STA website that lists All-Star as a subsidiary of STA,

14     without any indication of whether that's Inc. or it's LLC.

15          And to be clear and just to clarify, CLF spent

16     months determining or making as much effort as possible to

17     determine whether or not we did have the right entity.  There

18     is -- and not that this is in the record -- but there's

19     information regarding STA of Connecticut.  So that is another

20     STA entity that exists.  And I will say that what we also put

21     in the record is CLF's attempts, again and again, requesting

22     this information from the defendant.  At certain points we

23     knew that this was all ambiguous and we needed to know if we

24     had the right parent company.  And we were met with, I would

25     say, responses that clearly indicated they did not want to

1  provide that information to us.  The defendant was not

2  interested in providing that.  Which is why I actually had to

3  put a declaration into the record to show some of the

4  examples of where we attempted to discern who the right

5  entity was.  But, again, we're met with either silence or

6  just responses that did not answer the question.

7  THE COURT:  Okay.  All right.  So on the topic of

8  whether the Rule 16 standard applies in the first instance.

9  So here in this District when you file a complaint, a

10  scheduling order issues that day.  And you had a scheduling

11  order that issued in your case at ECF number 2, the day you

12  filed the complaint.  And that scheduling order did have a

13  deadline or amendments of pleadings and additions of

14  parties.

15  What significance should I attach to that here?  I

16  hear you telling me that Rule 16 doesn't apply because we

17  didn't have a deadline, but it looks to me like you did.

18  MS. GOVERN:  That initial deadline, yes, is

19  certainly the initial amended pleadings deadline in typical

20  scheduling orders.  I'm referring to the -- by mentioning

21  those other cases, I'm referring to the fact that there were

22  alterations and extensions on deadlines for scheduling

23  orders.  And often when those deadlines are not met, that is

24  often -- that is often a reason to not allow, I should say,

25  an amendment of the pleadings.

1          And I will say that, you know, as far as diligence

2    goes, the point that I want to make as well is that CLF

3    within 15 days made sure that we filed a Motion to Amend the

4    Pleadings.  And that was 15 days after receiving information

5    that we had requested again and again of the defendants.  We

6    did not delay.  We did not wait any further.  As soon as we

7    were aware of or had two examples and documentation that we

8    had the wrong defendants, we put that -- we got that filing

9    in basically as quickly as we could.

10          So, again, the diligence that I think CLF has shown

11   is through all the almost a full year of working out and

12   trying to figure out the proper defendant, and then as soon

13   as we did have some documentation showing that there was

14   something amiss, then we filed our request to amend.

15          THE COURT:  Okay.  So I haven't done this yet, but

16   I'm going to do it.  I'm going to sit down and I'm going to

17   build a timeline, exactly everything that's in the record

18   here.  But what I think I hear you telling me, Attorney

19   Govern, is that when I build that timeline, it's going to

20   show me that CLF asked this question as soon as it reasonably

21   could have been expected to, you know, was stonewalled by the

22   defendants for a year, and then moved for leave to amend its

23   complaint, you know, within 15 days of finally getting the

24   information that it was seeking.  That's what my timeline is

25   going to reveal?

1          MS. GOVERN:  Yes, Your Honor.  I do want to make one

2     more point.  As I talk about this ambiguity and what's out

3     there in the universe and what's publicly available, the

4     defendants make this point that there was a Connecticut

5     Secretary of State website stating or implying that the

6     entity that we had sued was defunct.  But that is not a

7     certification of that information.  The certification from

8     the Secretary of State that attests to this statement of

9     withdrawal registration is actually needed.  The defendants

10    themselves did not have that.  And this is why I want this on

11    your timeline.  They did not have that until June 16th of

12    2022.  And did not provide that to CLF until one month later

13    and that was once discovery had started.  So there might be a

14    lot of attention paid to the document, you know, that is

15    included in the record.  But, again, that wasn't a document

16    that the defendants themselves, they didn't have until June

17    16th of 2022.

18         THE COURT:  Well, they say that publicly available

19    to you on the Connecticut Secretary of State's website was

20    enough information.  They might even be willing to grant you

21    that it wasn't the perfect certified copy of the document,

22    but it was enough information for you to know that you had

23    the wrong guy.

24         MS. GOVERN:  It's possible, Your Honor.  I have to

25    tell you, there were so many additional documents other than

1    that one that demonstrated something completely different.

2    Not to mention we kept getting stonewalled by the defendants.

3    And so there was a real difficulty for our team to understand

4    exactly who we needed to have on this case.

5            THE COURT:  Okay.  All right.  I think I get it.

6            Well, that was my principal question to you.  I will

7    hear anything else that you want to say in support of your

8    Motion for Leave to Amend.

9            MS. GOVERN:  Well, I did want to bring up, Your

10   Honor, the fact that Federal Rule 7.1 which requires

11   defendants duty to identify its parent corporation.  That's

12   discussed in our Motion to Compel, but it relates to the

13   issue here.  And I just want to point that out, that there

14   has not been that identification.  And so, again, creating

15   more ambiguity for the situation.

16           THE COURT:  Okay.  All right.  Let me turn to

17   Mr. Shulan.

18           MR. SHULAN:  Good afternoon, Judge.

19           Would you like me to address some of what you've

20   discussed with opposing counsel?

21           THE COURT:  Yes, I have some questions for you.

22   Would you like to just hear them first?

23           MR. SHULAN:  I'd love to hear your questions, sir.

24   Yes, please.

25           THE COURT:  All right.  So the first question I have

1    for you is if you could just paint a picture for me of what

2    you think would probably happen if I were to deny this Motion

3    for Leave to Amend.  You know, am I right that what they

4    would do, they would go ahead and put STA, Inc. on notice and

5    then sue STA, Inc. in a separate suit?

6          MR. SHULAN:  I hope they don't do that, Judge,

7    because I'm not sure how they could comply with Rule 11 in

8    doing so.  I know you're on a Motion to Amend and which is

9    sort of broadly the pleadings and we accept everything as

10   true, but there is reality.  And STA, Inc. doesn't operate

11   buses.  It cannot be an actor held liable under the Clean Air

12   Act.  Its subsidiaries can.  And they have the right

13   defendant.  All-Star Transportation, LLC is the right

14   defendant.  It also happens to be the only defendant, because

15   the alleged violations occurred on dates and times at

16   All-Star's terminals, All-Star's buses, All-Star's drivers.

17         So I think -- I don't see how in good faith and

18   under the standard of certifying the factual basis and legal

19   basis for any paper signed by counsel, I don't see how that

20   could be.  I suppose you're right, though, that procedurally

21   if counsel felt it could correctly allege liability under the

22   Clean Air Act against STA, Inc., I suppose you're right,

23   that's probably what they would do.

24         THE COURT:  Okay.  And then the other question I had

25   reading the papers.  Your opponent says that it doesn't need

1    to plead a veil piercing claim or plead a plausible claim of

2    parental liability.  What would your response be to that?

3          MR. SHULAN:  I know of no exception to the

4    plausibility standard under the *Twombly vs. Iqbal* line of

5    cases that says, oh, veil piercing can be alleged under a

6    pure notice standard with no factual support that nudges the

7    claim past the line of plausibility.  I think that the

8    doctrine of plausible pleading that we are now operating

9    under and that we've been operating under --

10         THE COURT:  Sure.  And I'm sorry.  My question was,

11   you know, what do they have to plead plausibly, not, you

12   know, what a plausible claim is.  So what I hear you saying

13   is, you know, they've got to plead piercing the corporate

14   veil and everything that comes with that total dominion and

15   control and so forth.  And then I read them as something, no,

16   I've got to plead something short of that in this clean air

17   context.  I just need to plead -- I forget what the exact

18   formulation is but it's something like, you know, control

19   over decision-makings respecting pollution.  Something short

20   of ordinary veil piercing.  And that came in the reply brief

21   so you haven't had a chance to respond to that yet.

22         MR. SHULAN:  So we submit that there needs to be

23   factual matter, not just legal conclusions such as, you know,

24   control or dominion.  But there needs to be factual matter

25   from which the inference of total control, dominion,

1    et cetera, the elements of veil piercing under the law would

2    be met.  I don't think you could just formulaically recite

3    things that create alter-ego or veil piercing liability.

4           THE COURT:  Okay.  And I understand the plausibility

5    standard.  I just am trying to understand what target we're

6    shooting at for plausibility.

7           All right.  What else would you like me to know in

8    opposition to the Motion for Leave to Amend?

9           MR. SHULAN:  Well, if I may address this -- you are

10   going to, of course, probably likely visit with your clerks

11   and build a timeline.  And what you'll see I think just

12   because it's not subject to interpretation.  When we in

13   September of last year filed our Motion for Prefiling

14   Conference which, as the Court knows, is a Judge Arterton

15   protocol, we clearly said that the entity sued LLC had

16   withdrawn its registration.  We gave the date.  We said with

17   whom the registration was withdrawn.  It is true that we

18   didn't attach as like an exhibit the actual certification,

19   but we said it's a defunct entity in the Motion for Prefiling

20   Conference.  It was then the subject of sort of significant

21   discussion with Judge Arterton.  And I think a very key point

22   here on whether it's under the Rule 15 standard or the Rule

23   16 standard is the Judge heard all of this and simply said,

24   well, would you like to consider amending to address this

25   issue?  And counsel said, no, we've got it right.  And then

1    later, and this would be in any timeline that could be

2    constructed, in the parties Planning Report counsel doubled

3    down and said, no, there will be no amending of the

4    pleadings.

5         So I think Rule 16 applies either on the basis of

6    the Court's automatic scheduling order that's sort of

7    generated upon the filing of a civil action or the parties

8    affirmed their own view that there would not be amendments of

9    pleadings in that party's Planning Report which was adopted.

10   I think I have the docket number handy here.  The parties

11   Planning Report was 51 and the order adopting is 52.

12        So, I mean, I don't -- I just -- I think it's a

13   gross over simplification to say this is about we meant Inc.,

14   we wrote LLC.  We've made this abundantly clear for a really

15   long time.  And then critically, when there was an

16   opportunity to clean this up and fix it, counsel refused that

17   opportunity.  And I think that reflects a lack of care and a

18   lack of diligence.  This notion --

19        THE COURT:  I hear them saying that, you know, we

20   might have known we had it wrong.  What we didn't know was

21   what was right.  We didn't know that until July of this year

22   when we got the discovery responses.

23        What would be your response to that?

24        MR. SHULAN:  So to be -- to be a hundred percent

25   clear on this, the reason for the July disclosure is because

1   the parties exchanged their Rule 26(a)(1)(A)(i) documents on

2   that date.  And it was timely exchanged.  Their documents

3   came on -- their disclosures came on the same day ours did.

4   Actually, I take that back.  Our disclosures were exchanged

5   on the same day.  We did a rolling production.  We had to

6   mark some things with Bate numbers and just sort of some

7   technical housekeeping stuff.  But it rolled out.  They

8   certainly weren't untimely disclosed.  The fact remains the

9   parties did not exchange Rule 26 initial disclosures until we

10  did.  So I guess when you say, well, the action was filed in

11  February of 21 and defendants didn't produce this certain

12  until July of 22, makes it sound like we were sandbagging or

13  something.  But, I mean, there's no affirmative obligation

14  until you get to -- I guess what I would say is Rule 26 is

15  the trigger for that disclosure.  And so it wasn't made

16  belatedly.  But what we did was we highlighted it and it was

17  thoroughly discussed and incredibly accessible under what I

18  would consider to be diligent practice.

19          It wasn't delayed in any way.  I just want to make

20  sure the Court understands.  It's not as if we were obligated

21  to produce it earlier and through either consented to

22  extensions or just self-help extensions didn't give it to

23  them.  I mean, it was timely produced.  So I don't know how

24  you could really call it late.  I think that's an important

25  point.

1          THE COURT:  All right.  So, Mr. Shulan, before I

2    throw the mic back to Ms. Govern, because it's her motion so

3    she'll get the last word, is there anything else you'd like

4    me to know?

5          MR. SHULAN:  Well, I would, obviously, rely on our

6    extensive briefing of the Rule 15 factors.  But in case the

7    Court concludes for some reason that the rule -- for whatever

8    reason, that the Rule 15 standard applies, I do think

9    amendments should be denied under -- we're just making clear

10   that it's our position amendments should be denied under

11   either legal standard.  And if you wanted to get into that,

12   we could.  But, certainly, we don't want to just regurgitate.

13         THE COURT:  I think I understand the arguments in

14   the papers.  If there's something that wasn't in the papers,

15   this is your opportunity to share it with me.

16         MR. SHULAN:  No, Your Honor.  I think we'll just let

17   that represent our position on those issues.

18         THE COURT:  Okay.  Let me turn back to Attorney

19   Govern who gets the last word.

20         MS. GOVERN:  Thank you, Your Honor.

21         I'll just add that we talked a little bit about when

22   these documents came over almost a year later.  There's been

23   many settlement discussions.  We were even in mediation with

24   the defendants.  And there's been some back and forth

25   informal discovery information passed back and forth between

1    the parties.  And throughout all those discussions, CLF

2    attempted to clarify whether the correct defendant was here

3    and we did not get the information that was then provided

4    much later on.  And still are not receiving any information

5    about the corporate structure or organization which we've

6    additionally requested and is the subject of the Motion to

7    Compel.  And so I just wanted to point out that there have

8    been many opportunities for this information to be provided.

9    And as much as CLF made the attempts that they did, we were

10   not able, and being in the defendant's shoes, I'm sure it was

11   pretty clear to them what the structure is and who the parent

12   company is, but from an outsider it just has not been clear

13   and it has been ambiguous.  And that's why we filed our

14   amended complaint -- our request to amend as soon as we had

15   good clarification that we had the wrong defendant.  And

16   that's all.

17          THE COURT:  All right.  Well, thank you, Attorney

18   Govern.  I think I understand.

19          All right.  So let's turn to the Motion to Compel

20   here.

21          Attorney Govern, here, as with the Motion for Leave

22   to Amend, I'll let you say whatever you want, but if I could

23   put my questions out there first so you could be sure to

24   include them in your remarks that would be great.

25          So the first one I have is actually a technical

1    question.  So your motion, the motion itself just asks for

2    compliance with all of your interrogatories, requests for

3    production, but in your brief you listed just a subset of

4    those.  Am I right that you're just looking for an order with

5    respect to the subset?

6         MS. GOVERN:  Yes, Your Honor.  I think CLF wants to

7    show that we're reasonable in our requests here and make it

8    very clear what's most important for us for this segment of

9    discovery.

10        THE COURT:  Okay.  All right.  That's just a

11   technical question.  I'm glad we have that out of the way.

12        All right.  So my larger more substantive question

13   is so you have -- I didn't count them up -- but there's over

14   a hundred idling incidents referenced in your complaint,

15   right.  And tell me what you think the discovery you're

16   seeking will add to the jurisdictional analysis?  In other

17   words, what's its marginal utility?  Your opponent is making

18   a proportionality objection here.  I'm going to talk with him

19   for a minute about how timely it is.  But, you know, in

20   proportionality that's one of the things we consider is the

21   marginal utility here.

22        I think I hear you telling me in your reply brief

23   that you've got everything you need with a hundred or so that

24   you know about.  So what's the marginal utility of this here?

25        MS. GOVERN:  That's correct.

1            Your Honor, we're under the impression that even

2    despite merits being assumed on the Motion to Dismiss

3    briefing that has been pending, the specifics of the

4    frequency of excess idling falls within the scope of this

5    limited discovery.  This is what the defendants have in their

6    possession.  And it's very relevant to standing because CLF

7    has a certain number of standing witnesses that agreed to be

8    a part of this lawsuit.  Not an easy feat to get a large

9    number of people involved.

10           The standing inquiry in environmental cases, and

11   we've cited some Clean Air Act cases, some Clean Water Act

12   cases, because there's not many out there, but they take into

13   account how often the pollution occurs.  So when the Court

14   has to assess the standing witnesses experiences, their

15   fears, their actual harm, the harm that has affected them,

16   it's an important factor of the frequency of the pollution.

17   That is definitely reviewed by these courts.  And it's in

18   addition to what the standing witnesses are actually going to

19   say at their deposition or on the witness stand.  And the

20   pollution coming from that source can't really be separated

21   from the witness' exposure to the pollution.  And in this

22   instance it's how often pollution comes out of those tail

23   pipes.  That determines the harm to these standing witnesses.

24   And it's not necessarily that they were aware of it.

25   Sometimes they might have been, sometimes they weren't.  But

1   it's those repeated instances.  And because CLF could only

2   send out someone to observe those hundred violations that you

3   mentioned at certain times, couldn't have someone out there

4   24 hours a day and 7 days a week, the entire story of how

5   much pollution, how much exposure, how much harm these

6   standing witnesses are experiencing, that requires this

7   documentation that the defendants have.  And that's both

8   talking to the drivers, talking to the supervisors, and the

9   actual -- there's technology on the buses that can provide

10  information about when the engines are on, when they're off,

11  that sort of thing.

12         THE COURT:  Okay.  So, Attorney Govern, I heard you

13  loud and clear from your papers why you guys believe this

14  stuff is relevant.  So most of the time when we talk about

15  proportionality, the relevance of it is assumed.  And

16  basically what we're just asking, you know, okay, even if

17  it's relevant, does it have enough marginal utility here to

18  justify, you know, whatever the burden and expense is on the

19  other side.  I'm not good at making up examples on the fly

20  here, but I'm going to try one, you know.

21         If you were to have, you know, 20 interrogatories

22  and interrogatory number 19 says what color were all these

23  buses?  You know, I want you to go out in the yard and list

24  what color they all were and whatnot.  Maybe it's logically

25  relevant under Rule 401, but under a proportionality analysis

1    what we would ask is, you know, how much does it really add

2    relative to the burden and expense of making these guys do

3    this?  And, you know, I hear you saying that I've got them on

4    standing already with a hundred I know about.  So how much

5    more are we going to add here by making these guys collect

6    all of this data from all of these buses?

7          MS. GOVERN:  Well, as I mentioned, Your Honor, we

8    anticipate that the defendants are going to argue that this

9    specific person was not close to the buses on this specific

10   day.  And they're going to try to link up the violations to

11   the actual standing witness where they were that day, what

12   they were doing, that sort of thing which under the case law

13   is not actually required, but you never know what a judge is

14   going to decide and how they're going to determine harm and

15   how they're going to conduct a standing analysis in these

16   type of cases which is why we would need instead of saying

17   well, look, on Friday at 4:00 there was one instance of

18   idling versus saying all through that entire day, at periods

19   in the morning, at periods in the midday, and also in the

20   evening, there were instances of idling going on.  That's

21   what the documentation can show.  And so that is the, I would

22   say, that additional, you know, it's quite a bit of

23   additional harm.  It makes that connection.  It shows

24   traceability which is also required under the standing

25   analysis.  And it just boosts the understanding for the Court

1    and the harm and the traceability factors in the standing

2    analysis.

3            THE COURT:  Okay.  So basically, if I can try and

4    sum it up glibly.  You think you got them on what you know,

5    but you've got the right to ask if you've got them 12 times

6    on what you don't know.

7            MS. GOVERN:  That's right.

8            THE COURT:  Before I pass the mic to Mr. Shulan,

9    Attorney Govern, is there anything else you want to say in

10   support of the Motion to Compel?

11           MS. GOVERN:  I think I'll leave it at that for now.

12   Thank you.

13           THE COURT:  Okay.  All right.  So let me turn to

14   Mr. Shulan here.  So, Mr. Shulan, do not let me forget to ask

15   you about the timeliness of your proportionality objections.

16            But the first thing I want to ask you, you've got

17   the line in your opposition that CLF's members know the

18   frequency and regularity at which they have seen, smelled, or

19   been affected by an All-Star bus.  But is that really true?

20   I mean, isn't it possible that, you know, they were breathing

21   in diesel fumes from All-Star buses and don't know about it

22   until, you know, they know when that's happened?

23           MR. SHULAN:  I guess I don't know how that could be.

24   Critically, because in lots of environmental litigation it is

25   about inhalation of a pollutant and physical harm.  This

1  case, as alleged in the complaint, is an aesthetic injury, a
2  fear of going to a certain place and experiencing what would
3  otherwise be an enjoyable day because of it.  So I think that
4  awareness of it actually matters a lot.  In other words, if I
5  could distinguish our facts from a smokestack in a particular
6  location pumping out something terrible and someone being
7  injured by the inhalation of whatever was pumped out is not
8  the same thing as I used to really like to go down to this
9  particular stream and spend my lunch hour watching the fish
10  swim by, but I don't do it anymore because there's those
11  buses over there and I'm afraid of what I might breathe in
12  and I don't like the smells.  And that impairment of activity
13  I think -- I guess I'm having trouble logically getting to
14  how you could have the impairment of the experience without
15  having the why.  Why it's impaired is because of those buses
16  and because of -- not just those buses, but the excess idling
17  of those buses.  So I may be misunderstanding your
18  question.
19         THE COURT:  No, no.  Actually -- so I don't think
20  you were opposition paper really -- and if my eye passed over
21  it I apologize -- but I don't think your opposition paper
22  really tipped me off to the health versus aesthetic injury
23  distinction, but this is why we have these arguments.  So I
24  can understand you better.
25         Basically what I think you're telling me here is,

1    Judge, if you go back and you really study the complaint and

2    you see the specific things that they've alleged give them

3    standing, you know, some of the cases that they cite are

4    going to be distinguishable.  And moreover, we're going to be

5    talking here about an aesthetic injury that you would have to

6    see to know.

7            MR. SHULAN:  Right.  It's hard for me to understand

8    fear without the thing that caused you to be afraid.  It's

9    hard for me to understand avoidance without knowing what you

10   were trying to avoid.  So I think it's a little different

11   than -- and counsel is correct, there's not like an abundance

12   of cases addressing concrete actual imminent injury, you

13   know, that the first prong of Article III standing in the

14   Clean Air Act context.  She is right about that.

15           But I also don't know that it's so abstract that we

16   can't pin it down.  And I think what the Court -- forgive me

17   if you have more questions.  I'll make this brief.  And

18   certainly, please, well, I'd be delighted to answer more

19   questions.  But what I would say is here our overall -- if I

20   could boil it down to one thing, what we would say is the

21   injuries of these people lie solely within their knowledge.

22   We can't offer facts, evidence, documents, anything that

23   would show why the four standing witnesses that have been

24   identified and have given declarations on the nature of their

25   injuries, have met the actual concrete imminent harm barely

1   traceable to the alleged violations.  The Court has to assume

2   that that excess idling happened.  What's dangerous about

3   what counsel's asking for is they'd like to go beyond those

4   allegations.  They'd like to buttress and amplify those

5   allegations.  I would respectfully submit is that possibly

6   because would the amplified allegations witness one, two,

7   three, or four, might be able to have a better hook than that

8   person has right now?  I don't think that's allowed.

9         The case law is uniform on, you know, standing must

10  be established for each alleged violation.  And so if the

11  Court were to examine the table, which is at paragraph 140 of

12  the original complaint, there's like 83 -- I think the Court

13  said 100.  It might be that there's like 100 minutes or over

14  100 minutes.  There's 83 violations, unless I miscounted.

15  Forgive me if I did.  Those 83 violations are where we have

16  to start.  And only the four standing witnesses can speak to

17  the impairment of their aesthetic -- their aesthetic

18  experiences, impairing their aesthetic experience, their time

19  and leisure, and the rights that they have to just be happy

20  and be where they want to be in the world.  And then tracing

21  that to our idling, and not the idling or pollution of a

22  third party, that is all within their knowledge.  And to

23  allow them merits discovery, which it clearly is, with the

24  hope that, well, now, hey, our witness can talk about a whole

25  different violation on a different day at a different

1    location.  We're talking about four terminals.

2          Look, we're not here to litigate the forthcoming

3    12(b)(1) Motion to Dismiss for lack of subject matter

4    jurisdiction.  But I will tell you that even just looking at

5    the declarations that we have, we're not really seeing how

6    all of the terminals can even be implicated by what these

7    people have sworn to under the declaration statute.

8          So what I would say is I think it's a fishing

9    expedition for the purpose of buttressing the violations,

10   expanding the violations with the, I guess, the common sense

11   belief that if they could be expanded, if they could be

12   amplified, that just makes it more likely that one of these

13   four folks will be able to, you know, give facts in a

14   deposition that would make the requisite hook of causation

15   under the traceability element.  And I don't think that's

16   allowed and they are stuck with what's in the complaint.  It

17   has to be assumed as true.  We're not actually saying

18   we're -- I mean, between us and this argument, I know it has

19   to be assumed true for the 12(b)(1), but we're not just going

20   to concede later, if the Court were to find standing here,

21   that we violated the Clean Air Act 83 times.  That's not what

22   we're saying.  But we know the Court assumes that we did for

23   this limited purpose of standing.  And I think it just stops

24   there.  It stops at that moment in time where the standing

25   witnesses have their injurious experiences in a way that

1  satisfies the Constitution and the traceability requirement

2  in that context.  The plaintiff can't go down the road, make

3  it bigger, and then say, well, now, look, if we count these

4  other alleged violations, which are not alleged in their

5  pleading, well, now, maybe witness three has something to say

6  about the New Milford terminal or the Brookfield terminal

7  when heretofore they couldn't.

8          THE COURT:  All right.  Well, I think I get it.

9  Again, if I'm being glib here I apologize.  But I'm going to

10  sum that up in a few sentences.  Tell me if I've got this

11  right.

12          By saying that, you know, we all might be able to

13  make up a case in which a plaintiff has a Clean Air Act

14  injury without knowing it, but this isn't that case.  Because

15  if I go back and I really study their complaint now that I've

16  been hipped to this aesthetic dimension, I'm going to find

17  that the particular type of injuries that they're claiming,

18  you know, aren't the sort of thing that they could, you know,

19  that they could have and not know it.

20          MR. SHULAN:  That's right, Your Honor.

21          THE COURT:  Okay.  All right.  Well, let me ask you

22  about the timeliness of your proportionality objection.  So

23  you've got a couple of general objections about

24  proportionality which you know are disfavored.  And I think

25  we've only got specific objections to a couple of requests

1    here.  What would you tell me about the timeliness about this

2    and how would you respond to your opponent's claim that your

3    proportionality objections have been waived?

4        MR. SHULAN:  Certainly if -- and I'm not looking at

5    my discovery pleadings at the moment.  But if it is true that

6    under a specific interrogatory or a request for production,

7    the response contains an objection based on proportionality,

8    I mean, clearly, I don't think anyone would argue, not even

9    CLF, that that wasn't timely.  I mean, they were served

10   timely within the rules -- the time allowed under the rules.

11       To the extent there was a general objection which

12   we would like to deem to be incorporated into all of the

13   responses, you know, I would submit that it's clear enough

14   that maybe in certain instances the objection has more bite,

15   has more purchase, but it's not as if the questions to which

16   we didn't reiterate it below the specific request might not

17   also violate that principle of proportionality.  Sorry would

18   be thinking this a little bit out loud, but I don't really

19   think we have waived it.  If there is a case under which a

20   general objection not incorporated specifically under, you

21   know, request for production number 3 or interrogatory

22   number 4 is deemed waived, I would understand that authority.

23   But we think we made the objection where it was warranted and

24   applied it -- made and applied -- let me say one other thing,

25   Judge, if I could.

1          This was a tricky task answering these

2     interrogatories.  Look, we want to civil with everyone.  We

3     tried to construe every question as if it was intended under

4     the umbrella of limited jurisdictional discovery.  We were

5     careful to note that there is actually a statement in each

6     discovery pleading.  Again, I don't have it pulled up here.

7     But we did say all of these responses should be understood

8     and read as if the question were truly cabined to

9     jurisdictional discovery.  So I think it would be a little

10    bit tough right now, not particularly fair if we were held

11    to, well, if you read the question literally, you should have

12    interposed a proportionality objection when we specifically

13    said, look, we're not trying to waste everybody's time.

14    We're trying to get to the heart of the matter which is this

15    limited inquiry.  And so we read it that way and then maybe

16    didn't reiterate the general proportionality objection under,

17    again, items X, Y, and Z.

18          So it may not be the perfectly normal run of the

19    mill set of discovery where you might hold us to that

20    standard.  I do think we were trying in good faith to read

21    each request as if it were -- and there's examples of this

22    where you've seen them referred to STA and All-Star and the

23    relationship between them.  Well, under jurisdictional

24    discovery, the only jurisdictional discovery that was allowed

25    as to STA, LLC was personal jurisdiction.  So we read

1    it -- so it's not the parent of All-Star Corporation, right,

2    ALL-STAR Transportation, LLC.  I'm giving that as one sort of

3    off the cuff example of how we construed the request to be

4    what we thought they purported to be.  So it seems a little

5    tough for them to be held up, but if you read it literally

6    you should have reiterated your proportionality objection.

7    So I don't know if that makes more sense, Judge.

8              THE COURT:  Well, I think I understand.

9              Let me turn back to Attorney Govern here.  So,

10   Attorney Govern, I'm familiar with a bunch of cases that say

11   that that sort of general objection doesn't carry their

12   burden to show that the discovery shouldn't be had.  But, you

13   know, we've kind of got a separate question here, right.  And

14   the separate question is whether or not when they object in

15   this format they've committed a waiver.  And what would you

16   have me know on that point?

17             MS. GOVERN:  Your Honor, I'd first say that, you

18   know, these I called them untimely very specific objections

19   that come up here in the briefing are problematic.

20   They -- what is happening here is that the defendants are

21   explaining their objections based on proportionality in their

22   opposition.  They could have raised these in their formal

23   responses.  And are there circumstances that warrant excusing

24   the tardiness?  I don't think there's been a showing of good

25   cause here.  None of the information that we've sought from

1    the very beginning has changed.

2          THE COURT:  Well, if I could interject.  I'm sorry.

3          We've got a general objection that was timely.  What

4    we don't have is a specific objection that was timely, right.

5    So my question is whether that difference, you know, amounts

6    to a waiver?

7          MS. GOVERN:  Well, I would say that, you know, you

8    look at whether it's the balance between the burden and the

9    benefit.  I think I've talked quite a bit about the

10   importance of these specific documents for the purposes of

11   helping the Court to --

12         THE COURT:  Yes, I'm going to go form my thoughts on

13   what a proportionality analysis would reveal.  But what we're

14   doing here is we're having an antecedent discussion of

15   whether I even get to proportionality or did Mr. Shulan waive

16   it because he didn't put the word proportionality in the

17   right place in the document.  I understood your reply brief

18   to be saying that that's consequential.

19         MS. GOVERN:  Right.  Yes, definitely.  And I want to

20   make one more point.  Since this is a public interest suit,

21   and there's value in that in the proportionality analysis, I

22   think this was stated in our brief so maybe you'll review

23   this as well.  But we've got a Clean Air Act citizen lawsuit

24   here aiming to protect the environment, aiming to prevent

25   additional air pollution, and that matters as well in the

1   analysis, too.

2           THE COURT:  Okay.  All right.  So this, too, was

3   your motion.  And on this one as well, you get the last word.

4   Is there anything else you'd like me to know in support of

5   it?

6           MS. GOVERN:  Yes.  I'll just mention two more

7   things, Your Honor.

8           CLF did allege in the complaint that there was a

9   pattern and practice of idling going on at these lots, these

10  bus lots.  And the reason for that is because we based that

11  allegation on a representative sample.  We had our

12  investigators go out and look at -- and that's why if you see

13  in the actual chart there different days, different times,

14  because we did not want to just find, you know, one -- the

15  potential for just one bad actor, bad apple, you might say,

16  at the company.  We were trying to show that this is a

17  regular occurrence.  It's frequent.  And that is what the

18  pattern and practice allegations are based on.  And that's

19  really important because that is taken from the book of EPA.

20  The *U.S. vs. Paul Revere* case that we cite in our briefs did

21  the exact same thing and used investigators in the same way.

22  And you know the rest of the story of what happened in that

23  case.  It ended up settling.  But that is similar to exactly

24  what the federal agencies do and, actually, the state

25  agencies as well if they're enforcing the law.

1          And then, second, there's a little bit of a

2   confusion I think on whether our standing witnesses have just

3   aesthetic injuries or health as well.  Our standing witnesses

4   definitely have health injuries and harm to their health that

5   is alleged both in the complaint, but also is referenced in

6   the declarations.  And in Clean Air Act cases there's a

7   reason for why there might not be as much information as the

8   defendants could be expecting.  But plaintiffs in citizen

9   suit cases and Clean Air Act cases have standing where

10  they've experienced symptoms of the kind that the pollutants

11  cause while in the vicinity of that source.  So, again, I'm

12  going to use the term linking up.  There is no linking up

13  that has to be done.  And it's a lower standard regarding

14  actual harm to health in citizen suits and Clean Air Act

15  cases.

16          THE COURT:  You were giving me that standard there a

17  moment ago.  It sounded like you were reading from a case.

18  What's your citation?

19          MS. GOVERN:  I probably -- I probably am

20  paraphrasing when I said it the way I did.  So I'll give you

21  the *Environment Texas Citizen Lobby* case and that's 968 --

22          THE COURT:  Sure.  That's the one cited in your

23  brief, right?

24          MS. GOVERN:  Yes.  That's the 5th Circuit case.

25          THE COURT:  Yep, I did read that.

1          MS. GOVERN:  One that has not come up because you'll

2    see it in the Motion to Dismiss briefing will be a case out

3    of Utah.  And it's a 10th Circuit case.  And that is called

4    *Utah Physicians for a Healthy Environment*.

5          THE COURT:  Okay.  All right.  I think I get it.

6          Okay.  And, Mr. Shulan, I think I understand what

7    your rejoinders to all of that would be.

8          All right, everybody.  So we've got a criminal

9    matter at 2:00.  So this has kind of wrapped up right on

10   time.

11         Before we close here, let me just apologize to all

12   of you guys.  I know you were probably expecting to have this

13   argument sooner than we had it, but we actually had two COVID

14   cases in my Chambers, one right after the other.  First, my

15   law clerk and then me.  So I apologize that you're having

16   this argument more than a month after this case was referred

17   to me.  But we're on it.

18         We're going to take both motions under advisement

19   today.  We know that you're anxious for rulings on both of

20   them and we'll try to get them out to you as soon as

21   possible.

22         Okay.  All right.  If there's nothing further from

23   either counsel?  I'm not seeing anybody waiving at the camera

24   like they've got to say something.

25         We will stand in recess.

1          Thank you, everybody.

2          (Concluded at 1:57, p.m.)

3

4

5                C E R T I F I C A T E

6

7          I, Martha C. Marshall, RMR, CRR, hereby certify that

8     the foregoing pages are a complete and accurate transcription

9     to the best of my ability of the electronic recording of the

10    hearing held in the matter of CONSERVATION LAW FOUNDATION,

11    INC. VS. ALL-STAR TRANSPORTATION, LLC, et al, which was held

12    before the Honorable Thomas O. Farrish, U.S.M.J., at 450 Main

13    Street, Hartford, Connecticut, on October 26, 2022.

14

15

16

17                              /s/Martha C. Marshall
                                Martha C. Marshall, RMR,CRR
18                              Transcriber

19

20

21

22

23

24

25